**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**

GLORIA EMERY, CAROL GOLDBERG, and CASEY WHALEN, on behalf of themselves and all others similarly situated,

*Plaintiffs*,

v.

CAL-MAINE FOODS, INC.; ROSE ACRE FARMS, INC.; VERSOVA HOLDINGS, LLC; HILLANDALE FARMS OF PA., INC.; HILLANDALE-GETTYSBURG, LLC., HILLANDALE FARMS EAST, INC; HILLANDALE FARMS, INC.; DAYBREAK FOODS, INC.; URNER BARRY PUBLICATIONS, INC. d/b/a EXPANA; EGG CLEARINGHOUSE, INC.; UNITED EGG PRODUCERS; and JOHN DOES 1-10,

*Defendants*.

Case No. ___________________

**JURY TRIAL DEMANDED**

**CLASS ACTION COMPLAINT**

Plaintiffs Gloria Emery, Carol Goldberg, and Casey Whalen ("Plaintiffs"), on behalf of themselves and all others similarly situated, upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action complaint against the above-captioned defendants, Cal-Maine Foods, Inc. ("Cal-Maine"); Rose Acre Farms, Inc. ("Rose Acre"); Versova Holdings, LLC ("Versova"); Hillandale Farms, which is comprised of Hillandale Farms of Pa., Inc.; Hillandale-Gettysburg, LLC; Hillandale Farms East, Inc.; and Hillandale Farms, Inc. (together, "Hillandale Farms"); Daybreak Foods, Inc. ("Daybreak Foods"); Urner Barry Publications, Inc. d/b/a Expana ("Urner Barry" or "Expana"); Egg Clearinghouse, Inc. ("ECI"); United Egg Producers ("UEP");

and John Does 1-10 (together, the "Defendants") for violations of federal antitrust, consumer protection, and common laws.

## I. NATURE OF THE ACTION

1. This is a cartel action against the major producers of conventional eggs, yet another staple food product made unreasonably expensive by conspiracy in restraint of trade between the small number of companies responsible for this important part of the nation's food supply. Defendants conspired to fix, raise, maintain, and/or stabilize prices for conventional fresh shell eggs (referred to here as "Conventional Eggs" or simply "eggs") from at least as early as January 1, 2022, until Defendants' unlawful conduct and its anticompetitive effects dissipate (the "Class Period").

2. Conventional Eggs refers to the way the laying hens are kept and is distinct from "cage free" and "pasture". As of 2024, Conventional Eggs were approximately 75 percent of the U.S. shell egg market. Cage-free eggs make up more than 23 percent, and pasture-raised a sliver of the market.

3. Defendants Cal-Maine, Rose Acre, Versova, Hillandale, and Daybreak (together referred to as "Egg Producer Defendants") are the five biggest egg producing companies in the United States. Together they own almost half of all commercial layer hens.

4. Defendant Urner Barry is a publisher. It collects, analyzes, and disseminates detailed, granular industry intelligence to its customers in the egg, poultry, meat, seafood, plant protein, and related segments of the food industry. Urner Barry provides actionable competitive information related to the egg market to the Egg Producer Defendants and others.

5. To effect their collusive increases, the Egg Producer Defendants supplied inflated "assessments" of egg prices to Urner Barry. Urner Barry then knowingly laundered these reports, publishing price quotes using the Egg Producer Defendants' subjective and deliberately skewed

information along with data from its other subscribers. It also incorporated transaction prices from an online spot market provided by Defendant ECI—an opaque private spot market that is the equivalent of a "dark pool" for commodities.

6. In the thin volume of this non-public market, the Egg Producer Defendants' large size allowed them to manipulate the spot market pricing. This was critical for a simple reason: ECI spot prices are a direct input to Urner Barry's price quotes. The other major component is the subjective assessments. Egg Producer Defendants effectively steer both of these.

7. Urner Barry quotes, in turn, are a benchmark for the pricing of Defendants' sales of Conventional Eggs – nearly all of them.

8. In this way, Urner Barry and ECI not only incorporate but normalize and amplify price swings led by the largest-volume producers, who were conspiring together. This prevents independent, competitive decision-making by other producers from pulling the market price back to competitive levels. This is how the Defendants were able to sustain repeated price hikes that were not explained by costs or competitive supply factors.

9. Defendants have repeatedly blamed higher prices during the Class Period on Highly Pathogenic Avian Influenza H5N1 ("HPAI"). This is a pretext. It is true that HPAI led to a significant culling of layer hens beginning in late 2021. But HPAI does not account for the unprecedented surge in egg prices during the Class Period.

10. Economic research also shows that key inputs to egg production fell while egg prices continued to increase, so a cost shock does not explain the explosive growth in egg prices.

11. Defendants operate in an industry structurally susceptible to collusion. Among other things, the U.S. Conventional Eggs are a largely commoditized product. Production is highly

concentrated and the few large producers are vertically integrated. There are high entry barriers, category demand is inelastic, and there are numerous opportunities for industry leaders to collude.

12. Prices for conventional eggs have finally begun to subside, but only after the United States Department of Justice, Antitrust Division, ("DOJ") commenced an investigation, first reported in March 2025. According to news reports, several of the Defendants, including Cal-Maine, Rose Acre, and Urner Barry, are under investigation for price fixing. The New York Attorney General, known for its own antitrust unit, is also investigating anticompetitive conduct and high prices in the egg industry.

13. Defendants' conspiracy has harmed Plaintiffs and members of the Class (defined below), who are ordinary Americans just trying to put food on the table in an environment where staple after staple in the grocery basket has been forced to supracompetitive prices by unscrupulous agribusiness barons. The prices Plaintiffs and the Class paid for eggs during the Class Period were supracompetitive and the entire Class was uniformly harmed by purchasing in a market tainted by the cartel. Plaintiffs bring this class action Complaint against Defendants for violations of Section 1 of the Sherman Antitrust Act, state consumer protection laws, and common law.

## II. JURISDICTION AND VENUE

14. **Subject Matter Jurisdiction.** This Court has federal question subject matter jurisdiction for an injunction claim under 28 U.S.C. §§ 1331, 1337(a), and pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. The Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d) over the damages claims under the antitrust and consumer protection laws of several states.

15. **Personal Jurisdiction**. This Court has personal jurisdiction over Defendants because they transact business or may otherwise be found in this District. Moreover, Defendant Rose Acre is headquartered in this District.

16. **Venue.** Venue in this District is proper as Defendants transact business or have registered agents in this District. Defendant Rose Acre maintains its headquarters in this District, and, as alleged herein, the conduct of all Defendants caused harm to Class members in this District.

17. **Interstate and Intrastate Commerce**. Defendants' conduct as alleged herein substantially affects interstate trade and commerce by harming competition, raising prices, restricting output, and harming Class members throughout the United States. Conventional eggs are a widely traded commodity and affect the intra-state commerce in each state in which they are sold, typically changing hands between a local grocer, supermarket or warehouse retailer and end consumers within each state in a large volume or transactions.

## III. PARTIES

### 1. Plaintiffs

18. Plaintiff Gloria Emery is a citizen of Hawaii, residing in Hawaii County. Plaintiff Emery purchased Conventional Eggs produced by the Egg Producing Defendants, indirectly for personal use and not for resale, from one or more retailers during the Class Period. By paying artificially inflated prices for Conventional Eggs, Plaintiff Emery suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

19. Plaintiff Carol Goldberg is a citizen of Colorado, residing in the City and County of Denver. Plaintiff Goldberg purchased Conventional Eggs produced by the Egg Producing Defendants, indirectly for personal use and not for resale, from one or more retailers during the Class Period. By paying artificially inflated prices for Conventional Eggs, Plaintiff Goldberg suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

20. Plaintiff Casey Whalen is a citizen of New Hampshire, residing in Rockingham County. Plaintiff Whalen purchased Conventional Eggs produced by the Egg Producing Defendants, indirectly for personal use and not for resale, from one or more retailers during the

Class Period. By paying artificially inflated prices for Conventional Eggs, Plaintiff Whalen suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

**2. Cal-Maine**

21. Defendant Cal-Maine Foods, Inc. is a public company incorporated in Delaware with its principal place of business in Ridgeland, Mississippi.

22. Cal-Maine was founded in 1957 as Adams Food. In 1969 it merged with Dairy Fresh Products and Maine Egg Farms to form Cal-Maine Foods. Since then, Cal-Maine has continued to aggressively acquire egg producers around the country. Over the years, Cal-Maine has acquired and integrated nearly 30 companies to become the behemoth it is today. In 2024 alone, Cal-Maine acquired three additional companies and added 5.9 million egg-laying hens to its flock.

23. Today, Cal-Maine is the largest producer of eggs in the United States. As of 2024, Cal-Maine had nearly 45 million egg-laying hens, and it controlled approximately 20% of national egg sales. It is also a fully integrated company with its operations consisting of hatching chicks; growing and maintaining chicken flocks; manufacturing feed; and producing, processing, packaging and distributing shell eggs. In 2024, Cal-Maine achieved sales of $2.33 billion with over 1.15 billion dozen eggs sold.

24. Cal-Maine has forty-nine egg production facilities in the United States, including in Alabama, Arkansas, Florida, Georgia, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Ohio, Oklahoma, South Carolina, Texas, and Utah.

25. Upon information and belief, Cal-Maine subscribes to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg price index.

26. During the Class Period, Cal-Maine sold Conventional Eggs to purchasers in the United States, including members of the Class.

**3. Rose Acre**

27. Rose Acre Farms, Inc. is a private company incorporated in Indiana with its principal place of business in Seymour, Indiana.

28. Rose Acre is the second largest egg producer in the United States. As of 2024, it had nearly 26 million egg-laying hens.

29. Rose Acre has sixteen egg production facilities in the United States. These facilities are located in Indiana, Illinois, Missouri, North Carolina, Georgia, Iowa, and Arizona.

30. Upon information and belief, Rose Acre subscribes to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg price index.

31. During the Class Period, Rose Acre sold Conventional Eggs to purchasers in the United States, including members of the Class.

**4. Versova**

32. Versova Holdings, LLC is a private company incorporated in Delaware with its principal place of business in Sioux Center, Iowa.

33. Versova is one of the largest egg producers in the United States. As of 2024, it had over 18 million egg-laying hens.

34. Versova has several egg production facilities in the United States, including five in Iowa. It also has facilities in Ohio, Washington, and Oregon.

35. Upon information and belief, Versova subscribes to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg price index.

36. During the Class Period, Versova sold Conventional Eggs to purchasers in the United States, including members of the Class.

**5. Hillandale Farms**

37. Defendant Hillandale Farms is comprised of several related companies, including Defendants Hillandale Farms of Pa., Inc., Hillandale-Gettysburg, LLC, and Hillandale Farms East, Inc.—all incorporated in Pennsylvania—and Hillandale Farms, Inc., incorporated in Ohio. Hillandale Farms is headquartered in Gettysburg, Pennsylvania.

38. Hillandale Farms is one of the largest egg producers in the United States. It produces approximately 38 million dozen eggs per month. As of 2024, it had nearly 19 million egg-laying hens.

39. Hillandale Farms has several egg production facilities in the United States, including in Pennsylvania and Ohio.

40. Hillandale Farms was recently acquired by Luxembourg-based company Global Eggs for over $1 billion.

41. Upon information and belief, Hillandale Farms subscribes to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg price index.

42. During the Class Period, Hillandale Farms sold Conventional Eggs to purchasers in the United States, including members of the Class.

**6. Daybreak Foods**

43. Daybreak Foods, Inc. is a private company incorporated in Wisconsin with its principal place of business in Lake Mills, Wisconsin.

44. Daybreak Foods is one of the largest egg producers in the United States. It produces approximately 16 million eggs per day. As of 2024, it had over 20 million egg-laying hens.

45. Daybreak Foods has several egg production facilities in the United States, including in Wisconsin, Minnesota, Iowa, and Ohio.

46. Upon information and belief, Daybreak Foods subscribes to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg price index.

47. During the Class Period, Daybreak Foods sold Conventional Eggs to purchasers in the United States, including members of the Class.

**7. Urner Barry**

48. Urner Barry Publications, Inc. is a private company incorporated in New Jersey with its principal place of business in Toms River, New Jersey. For decades Urner Barry has published egg prices to industry participants, including the Egg Producer Defendants.

49. Urner Barry founder Benjamin Urner began publishing market reports in the 19th Century, providing pricing on various agricultural goods shipping in and out of New York. This "Producers' Price-Current," later became the "Urner Barry's Price-Current." Urner Barry eventually renamed itself Urner Barry Publications and relocated to New Jersey.

50. From the mid-1970's onward, Urner Barry expanded its publication and service portfolio to new markets beyond poultry and eggs, such as seafood, and later, beef and other mammal meats, in part through acquisitions. But it maintained its presence in the poultry and egg industries, and in 1976, Urner Barry debuted the Executive Conference in New Jersey, the most widely attended marketing event in the poultry and egg industries.

51. In recent decades, Urner Barry introduced an online portal called Comtell On-Line ("Comtell"). Urner Barry calls Comtell "the most accessible, accurate and timely source for news, quotes and research" in the egg industry (it also covers several other food industries). Comtell subscribers get access to data that is "updated several times a day" about the "most impactful market conditions."

52. Urner Barry was at one time a subsidiary of AgriBriefing Limited. In 2023, the U.K.-based Mintec Group acquired AgriBriefing in a deal that included Urner Barry. Like Urner

Barry, Mintec is a provider of market intelligence and price data. In 2024, the Mintec Group consolidated all of its operations under a single brand name: Expana.

**8. Egg Clearinghouse**

53. Defendant Egg Clearinghouse, Inc. is a Delaware corporation with its offices and principal place of business located in Dover, New Hampshire.

54. During the Class Period, ECI operated as an online spot market that allows participants to place bids on eggs listed for sale and see the results of trades.

55. Only ECI members (*i.e.*, farmers and egg buyers) are allowed to trade on the ECI marketplace.

56. ECI's spot market is lilliputian compared to the total commerce in conventional eggs: only about 5% of eggs are transacted on this market, about 2.6 billion eggs in 2024. But this market is a key component in how the other 95% of egg transactions are priced.

**9. United Egg Producers**

57. Defendant United Egg Producers d/b/a Egg Farmers of America ("UEP")and its affiliates are an industry trade group. UEP is a Maine corporation with its offices and principal place of business located in Johns Creek, Georgia.

58. UEP is a national cooperative of egg farmers that collectively own approximately 95% of all US layer hens.

59. The United Egg Association ("UEA") is a trade association affiliated with UEP. UEP formed the United Egg Association (UEA) in 1983. Expanded in 1995, UEA serves as a national trade association representing three distinct segments of the U.S. egg industry – further processors, allied members, and producers and packers.

**10. Unnamed Co-conspirators and Other Non-Parties**

60. Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts in furtherance of the illegal conduct described herein: John Does 1-10. Defendants are jointly and severally liable for the acts of these unnamed co-conspirators.

61. Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

62. Defendants are also liable for acts done in furtherance of the alleged conduct by companies they acquired through mergers and acquisitions.

## IV. FACTUAL ALLEGATIONS

### A. Egg Production the United States

63. Eggs are a staple food, the cornerstone of American hot breakfast, and an essential ingredient in baking and numerous other dishes. American consumers eat about 280 eggs each per year, and American producers ship about 100 billion eggs each year.

64. Conventional eggs are chicken eggs, so the egg industry is part of the poultry industry. In poultry production, primary breeder flocks consist of elite "pedigree" or "foundation" birds, great-grandparent birds, and grandparent birds. These several generations of flocks then produce the final generation of breeding birds, called parent flocks or multiplier flocks. Eggs from multiplier flocks hatch to become layer hens – the hens whose eggs are sold for human consumption. Other birds are shipped to production farms and raised for meat.

65. The egg production cycle is relatively straightforward to forecast. It follows predictable mathematical principles and can be adjusted with precision. Producers therefore can

and do intentionally reduce supply, delay new flocks, or retire hens early—actions that, if taken collectively, can artificially constrain supply and raise prices.

66. Egg producers also keep eggs in cold storage capacity when prices are low and release excess inventory when market prices are favorable.

67. The cycle's predictability and the long lead times for production decisions create conditions that allow for anticompetitive coordination.

68. The U.S. government, through the U.S. Department of Agriculture ("USDA"), has established a comprehensive and detailed system of grading and sizing standards that ensures uniformity across the shell egg market.

69. Specifically, USDA Consumer Grades, such as Grade AA, Grade A, and Grade B, are based on specific interior and exterior quality factors. Similarly, sizes are standardized by weight per dozen, including Jumbo, Extra Large, Large, Medium, and Small. These government-mandated standards strip away most avenues for product differentiation. A "Grade A Large" egg from one producer is, for all practical purposes, identical to and perfectly substitutable with a "Grade A Large" egg from any other producer.

70. The United States egg industry produces eggs for two primary uses: (a) "shell eggs" or "table eggs," whole eggs that consumers buy, and (b) "breaker" eggs, which are unshelled and pasteurized in liquid or dried form, usually for food service. About 70% of eggs are sold as shell eggs. Some of the shell eggs are "quality-differentiated" products—such as cage-free or organic eggs—that command retail premiums over Conventional Eggs.

71. Egg production is spread across the United States, but production is concentrated in the upper Midwest, with three midwestern states producing over ten billion eggs per year.




**Figure 1.**[1]

**B. Consolidation in the Egg Industry**

72. Throughout most of the country's history, egg production was highly fragmented and involved thousands of independent farms.

73. Consolidation was slow at first. By 1978, the top 34 farms accounted for collectively just 27 percent of the nation's laying hens. Still, the five million egg farms at the dawn of the twentieth century became fewer than a thousand at the dawn of the twenty-first. By 2000, 63 companies had 1 million or more hens, and they represented 78% of the nation's total flock.

74. Today, the "Big Five" Egg Producer Defendants—Cal-Maine, Rose Acre, Versova, Hillandale Farms, and Daybreak Foods collectively control nearly 50% of all U.S. laying hens.

[1] https://www.nass.usda.gov/Charts_and_Maps/Poultry/eggmap.php

Cal-Maine alone has almost 20 % of U.S. egg sales. The Defendant's concentration is higher in some regions, such as California, where just four companies control about two thirds of the layer hens. The fringe of the market outside the Big Five is fragmented and the producers are much smaller.

75. The "Big Five" grew to their current size by a series of acquisitions that took mid-sized rivals off the playing field by absorption.

76. Cal-Maine tripled its flock overnight in 1988 by purchasing Cargill's egg division. This acquisition made it the largest producer in the egg industry, a status it retains. The company has made at least twenty-five additional acquisitions.

77. Cal-Maine's other significant acquisitions include:

a) **1999:** Hudson Brothers, Inc. of Guthrie, Kentucky (1.2 million layer hens)

b) **2008:** Tampa Farm Service, Inc. and Zephyr Egg Company (6 million layer hens)

c) **2012:** Pilgrim's Pride and Maxim Production Co., (4.9 million layer hens)

d) **2016:** Foodonics International (3.1 million layer hens)

e) **2019:** Mahard Egg Farm (3.9 million layer hens)

f) **2022:** Red River Valley Egg Farm (1.7 million layer hens)

g) **2024:** Fassio Egg Farms, Inc., located in Erda, Utah, (1.2 million layer hens)

h) **2024:** ISE America, Inc. (4.7 million layer hens)

78. Similarly, the other Egg Producer Defendants become giants through serial mergers, including at least the following:

- **2016:** Versova formed through the roll-up of several established producers. It grew its capacity further by acquiring Willamette Egg Farms—adding

over 3 million layers—and Rembrandt Foods (now known as Ovation Farms) in 2021.

- **2020:** Rose Acre announced a joint venture with Weaver Brothers Inc. to purchase Opal Foods. At the end of 2019, Opal Foods had nearly 8 million layers.
- **2023:** Daybreak Foods acquired Hen Haven, LLC and Schipper Eggs, LLC and in 20222 it acquired Konos, Inc. (d/b/a Vande Bunte Eggs).
- **2025:** Hillandale Farms was acquired by Luxembourg-based company Global Eggs for over $1 billion. Global Eggs operates large egg producers around the world and has combined revenues of over $2 billion.

79. The Egg Producer Defendants are all vertically integrated. They own their own breeder flocks, operate multiplier and pullet farms, manufacture feed, run in-house grading and breaking facilities, and maintain dedicated trucking fleets.

80. For example, Cal-Maine hatches most of its layer hens in its own multiplier farms and grows them in its own pullet farms. When they reach egg-laying age, Cal-Maine keeps about 90% and sends the rest to contracted farms. These layer hens are fed from Cal-Maine's own feed mills. The eggs they produce, Cal-Maine cleans, grades, and packages at its own packing facilities for sale as shell eggs or breaks and pasteurizes them. Finally, Cal-Maine packs its table-eggs and egg products to be picked up by customers, or ships them to customers' warehouses and stores, often in its own delivery truck fleet.

81. Cal-Maine has its own +10 million-bird breeder program, which gives it leverage over the replenishment stock needed by rivals that lack comparable breeding capacity. In a 2020

investor presentation, Cal-Maine touted that "[f]rom hatching to production, our facilities are capable of producing and processing 6.6 million eggs per hour."




**Figure 2.**[2]

82. Defendant Rose Acre similarly maintains a breeder flock. Independent producers without breeder flocks find that the sources for replacement pullets are very limited – either Cal-Maine and Rose Acre, their direct competition in egg production, or just two poultry genetics firms, Hendrix Genetics and EW Group.

83. Hendrix Genetics and EW Group control the "parent flock," which produces the entire supply of pullets sold to downstream egg producers.

84. This duopoly at the top of the supply chain functions as a structural chokepoint in the egg market which helps facilitate the producer-level conspiracy. The genetics firms have an incentive to keep supply low and prices high for pullets, and while Plaintiffs allege no collusion in this regard, the constraint in the uber-concentrated supply chain for layer hens has the effect of

[2] Cal-Maine, Investor Presentation (August 2020).

protecting the downstream collusive arrangement in egg production. The constrained supply of new layer hens, even if entirely independent of the Egg Producer Defendants creates a risk of input foreclosure, preventing both new entrants and existing producers from easily expanding supply. Even if a non-conspiring producer wanted to break the conspirators' control on supply, where would it get the new layer hens necessary to "move the needle" against the industry giants? Practically, industry conditions have foreclosed the possibility of a disruptor breaking the cartel's ability to command supracompetitive egg prices.

**C. Anticompetitive Conduct**

85. U.S. egg industry priced has long been characterized by relative price stability, with periodic, mild price-output cycles. Since industry consolidation in the 1980s and 1990s, however, cyclic fluctuations have increased in frequency and volume. One feature of the new landscape is production rigidity, where output does not rapidly adjust to new conditions. Following the supply shocks during the 2020 COVID-19 pandemic, Defendants hatched their conspiracy to fully depart from competitive pricing dynamics and command a fully cartelized price.

86. In March 2025, the average price of grade A egg prices shot up to $6.23 per dozen.

87. Egg Producer Defendants have attributed these price increases to supply disruptions caused by HPAI outbreaks beginning in late 2021. This is a pretext. The relationship between flock size and production is mathematically predictable, and these price spikes exceeded what the flock losses explain.

88. The true explanation for the price spikes is collusion. The industry is in the hands of a few players, with all the informational tools to set prices as a cartel. The Egg Producer Defendants coordinated with each other to systematically increase the price of eggs by manipulating egg pricing benchmarks such as those published by Urner Barry and ECI.

**a. Urner Barry and ECI Provide Egg Price Benchmarks**

89. Many agricultural commodities publicly trade on regulated exchanges, which act as a brake on price manipulation. Eggs have no such transparency. What economists call price discovery, in this industry, is in the hands of two private, industry-cozy firms: Defendant Urner Barry, which issues the "Urner Barry quote" or "UB quote" which serves as a *de facto* pricing benchmark for eggs nationwide, and Defendant ECI, with its "dark pool"-like spot market.

90. Most eggs are sold on contract, and most egg contracts set a price anchored by the Urner Barry's egg quotations (UB quotes), which in one form or another have been the industry's benchmark since at least before the Second World War.




**Figure 3.**[3]

91. Defendants and their co-conspirators are acutely aware of the role that Urner Barry's Price-Current reports and indexes play in contract egg pricing nationwide, which is ~95% of the Conventional Egg commerce. Cal-Maine admits in its annual securities filings, "the majority of conventional shell eggs sold in the U.S. in the retail and foodservice channels are sold at prices that take into account, . . . quoted wholesale market prices, such as those published by Urner Barry."

[3] https://www.comtell.com/Marketing/Market-Prices.

92. The overwhelming majority of wholesale egg contracts are based on Urner Barry's daily quotations as the reference price, meaning even small upward shifts in reported values immediately translate into higher prices for purchasers.

93. The data for these daily Urner Barry reports is supplied by producers, distributors, brokers, and buyers—including the Egg Producer Defendants—reporting transaction prices, bids, and offers. Urner Barry also takes into account prices gleaned from the Egg Clearinghouse, but only as a component. Urner Barry employs reporters to collect all this data and they work the phones and electronic communication media from 8:45 a.m. to 5:00 p.m. Eastern, every business day.

94. Because virtually all commercial egg transactions reference Urner Barry's numbers, even modest movements in Urner Barry's daily quotation instantaneously re-price billions of eggs in the pipeline.

95. Urner Barry claims that "We guard against the risk of manipulation by adhering to the IOSCO methodology."[4] Urner Barry is audited each year by accountancy firm BDO USA P.C. ("BDO") for compliance with IOSCO standards. While Urner Barry claims to have always passed, BDO's reliability has fallen into serious doubt. In 2023, "[t]wo-thirds of [BDO's] audits picked for inspection fell short of US standards."[5]

96. In addition to its daily market quotations, Urner Barry also publishes forward-looking egg market forecasts, doing mathematical projection from pipeline data like eggs in incubators, chicks hatched, intended placements, rate of lay, along with other factors. Urner Barry

---

[4] https://hntrbrk.com/big-egg/.

[5] https://www.bloomberglaw.com/bloomberglawnews/financial-accounting/X5OP4188000000?bna_news_filter=financial-accounting#jcite.

advertises these reports as tools that allow subscribers to "identify trends before they happen" and "create sound business strategies."[6]

97. While less than 5% of the egg transactions occur on the ECI, its pricing is a component of Urner Barry's quotes, so it has an outsized impact on contract pricing.

98. The low number of transactions on the ECI and the Defendants' dominant collective market share allow the Egg Producer Defendants to effectively control the volume and pricing on the ECI platform, which are then incorporated into the Urner Barry quote. The dominant firms need not fear the erosive effect of a large competitive fringe in a distributed marketplace, because they can collectively move the ECI spot price, which is a direct input into Urner Barry, and thus into each contract with their large customers.

99. ECI is a member-only platform comprised of farmers and ECI's egg buyers board. Historically, the board included industry executives like Cal-Maine's founder.

100. Urner Barry and ECI provide the means for the Egg Producing Defendants to have their collusively determined price increases stick in the marketplace and not be disciplined or eroded by the many small independent producers.

**b. Egg Producers Conspired to Artificially Increase the Price of Eggs Using Urner Barry Egg Price Indexes**

101. As explained above, Defendant Urner Barry's wholesale daily quotes anchor the calculation of almost every egg sale. This structural feature of the egg market ensures that any inflation in Urner Barry's benchmark prices is rapidly transmitted throughout the entire industry. Over 95% of eggs are sold pursuant to contracts pegged to Urner Barry's quotations, and fewer than 5% of eggs are sold on the ECI spot market (which is itself an Urner Barry component).

[6] https://urnerbarry.com/Consulting/Blog/UBC-Blog/1241895.

102. Urner Barry's pricing is based in mostly based on self-reported transaction data. The dominant firms supply the most transaction data. The system is ripe for manipulation, if (and only if) the dominant firms decide to act collusively.

103. By submitting elevated prices, the Egg Producer Defendants can and do push Urner Barry's benchmark upward, knowing that the new higher price automatically impact future contract transactions.

104. This creates a self-reinforcing feedback loop. Elevated benchmark prices increase the revenue received on each sale, which in turn increases the baseline for the next round of reporting. The industry's pricing system thereby amplifies upward movement and resists downward correction. In a concentrated market where a few large firms control half of all production, manipulation is effective.

105. The susceptibility to manipulation is highlighted by the relative stability of specialty and cage-free eggs. With higher production costs, they are less often linked to Urner Barry and more often priced by cost-based terms, and they did not demonstrate the same extreme price spikes during the conspiracy.

106. In the five months prior to the 2021 HPAI outbreak, cage-free eggs averaged $0.65 more per dozen than conventional eggs, because it costs more to run an egg farm where the chickens have more room to move. But after Defendants began increasing Conventional Egg prices, in 2022, conventional egg prices ***exceeded cage-free prices by $0.33*** on average. In 2023 cage-free eggs were only 17% more than Conventional Eggs, and by 2024 only 2% higher. Then, the inversion repeated itself at the end of 2024! The shocking disappearance and periodic inversion of the cost-based gap between cage-free and Convention Eggs defies economic explanation absent manipulation.




**Figure 4.**[7]

107. The industry has experience with contagion-related flock losses. The monthly losses in layer hens since 2022 resemble 2015, when the industry lost 43 million layer hens to a different avian flu strain. But the per-lost-hen impact of the contagion is strikingly different: prices since 2022 increased ***more than three times*** as much per lost hen as in 2015.

108. The problems of rapid consolidation to high concentration and common reliance on "business intelligence" firms that allow the major players to illegally coordinate is not unique to this industry. Indeed, prior antitrust actions in beef, poultry, pork and even seafood markets have been dubbed "protein cases" within the legal world. Several have produced government investigations and even criminal convictions.

109. The egg market exhibits the same fundamental dynamics. Urner Barry's reporters do not verify most transaction reported by industry participants. It processes the information in its own proprietary "black box," but the major producers understand the impact of their inputs, allowing them to affect the results. The Egg Producer Defendants can monitor each other's

[7] https://hntrbrk.com/big-egg/.

reported prices, verify adherence to coordinated price levels, and punish deviations by reverting to benchmark-linked pricing in subsequent transactions.

110. Analysts and consumer advocates have noted that bird flu losses in recent years have been insufficient to explain the magnitude of the price spikes. Hunterbrook's analysis of USDA data found that the total effective loss to the national layer hen supply was only about 1% compared to 2021, but average wholesale prices rose 127% in 2022, and then 54.6% in 2023. As a function of lost supply, this is respectively a 25% and then a further 17% increase in price, for every 1% decrease in supply. This is wildly out of step with historical norms for contagion losses.

111. Additionally, the actual domestic egg supply fell even less than the flock size, due to a significant reduction in egg export and an unprecedented increase in laying rate per hen, owing to improved genetics.

112. Comparison to Europe, also highlights the anomaly of U.S. pricing. Europe lost 50 million layer hens, compared to 43 million in the U.S. But European prices for eggs only rose about 30% in Europe in the year January 2022 to January 2023, while U.S. prices rose nearly 170% over the same period. Outbreak losses cannot explain this.

113. The correlation between Urner Barry's quotations and conventional egg price spikes, combined with the absence of competitive market discipline, supports a strong inference that Defendants used the Urner Barry system to communicate, monitor, and enforce supracompetitive pricing.

114. Urner Barry provides both the forum for information exchange and the enforcement mechanism for maintaining elevated prices.

115. The vertical integration of the Egg Producer Defendants further strengthened the effectiveness of this arrangement. These major players control not only production but breeding,

processing, and distribution. They can exercise supply discipline and hold increases because they have largely excluded the possibility of enough selling under their cartel pricing to erode their supracompetitive profits.

116. Because of the Defendants' market concentration, deviations from Urner Barry's benchmarks could be swiftly detected and addressed. Any short-term gain from discounting would be outweighed by the risk of retaliation in future transactions, making adherence to coordinated prices the rational choice for all conspirators.

117. Cartel pricing has been very, very good to the Egg Producer Defendants. Cal-Maine, for example, reported gross margins approaching 40% during the conspiracy period, and quarterly profits at much higher levels. These profits came directly at the expense of egg purchasers, including Plaintiffs and members of the Class, who paid much more for eggs than they would have in a competitive market.

118. No set of assumptions about individual, competitive, profit-maximizing decisions is consistent with the observed behavior. The plausible, and indeed obvious inference is a coordinated strategy, implemented through a centralized price reporting system, to fix, raise, and maintain egg prices at artificially high levels in violation of the Sherman Act.

**c. Input Price Increases do not Explain Egg Price Increases**

119. Feed – primarily corn and soybean meal – is the major cost component in the production of shell eggs, accounting for more than half of farm production costs.

120. Fuel costs, typically propane or natural gas, is another input to poultry farming.

121. Data from the U.S. Bureau of Labor Statistics show that these cost inputs have decreased since 2022.

122. Cal-Maine's financial disclosures confirm that production costs have gone down, not up, as Cal-Maine's profits have skyrocketed.

123. Under competition, one would expect price paths to track costs and supply shocks. That has not been the case in the shell egg market. Instead, prices and costs have diverged, to the profit of shell egg producers.

**d. U.S. Department of Justice and New York Attorney General Investigations**

124. On March 6, 2025, various news outlets, including *The Capitol Forum* and *The Wall Street Journal*, reported that DOJ was investigating whether egg producers—including Defendants Cal-Maine and Rose Acre—had conspired to raise prices of eggs. According to the reporting, DOJ sent letters to egg producers asking them "to preserve documents about their pricing conversations with customers and competitors, as well as communications with Urner Barry."[8]

125. In a 10-Q SEC filing published April 8, 2025, Defendant Cal-Maine confirmed it was under investigation by DOJ. In that filing it stated that it received a civil investigative demand from DOJ in March 2025.

126. After the investigation became public, egg prices dropped precipitously. For instance, on March 5, the average wholesale cost of a dozen large grade A white eggs was $8.12. On March 19, about two weeks after DOJ's investigation became public those same eggs cost $3.03—***a 62.7 percent decrease.*** Egg prices at retail also dropped around this time. The speed and magnitude of the price drop strongly suggest that prior egg prices were sustained through coordinated conduct, rather than competitive market forces.

[8] Dave Michaels, "Justice Department Opens Probe of Sharp Surge in Egg Prices," *The Wall Street Journal* (March 7, 2025).




**Figure 5.**[9]

[9] https://www.thesling.org/did-dojs-investigation-of-the-egg-industry-cause-egg-prices-to-fall/.




**Figure 6.**[10]

127. On May 8, 2025, Senators Elizabeth Warren (D-Mass.) and Jim Banks (R-Ind.) released a letter in support of DOJ's investigation. In their letter, the senators were skeptical of the claims of egg producers and trade associations that recent avian flu outbreaks were the sole cause of high prices. They expressed that they "are concerned that record high egg prices reflect noncompetitive behavior among large producers." Additionally, the senators urged DOJ "to

[10] https://www.thesling.org/did-dojs-investigation-of-the-egg-industry-cause-egg-prices-to-fall/.

consider whether a precipitous drop in egg prices just days after reports of the investigation broke suggests that egg producers had conspired to artificially inflate prices."[11]

128. Most recently, in a 10-Q SEC filing published October 1, 2025, Defendant Cal-Maine, disclosed that it "received a subpoena from the State of New York requesting information and documents related to its investigation of anticompetitive conduct and high egg prices in the egg industry."[12]

**e. Prior Actions Against Defendants**

129. The egg industry, including several of the Defendants named here, have previously been targeted by private litigants and government enforcers for anticompetitive and unfair business practices.

130. Starting in September 2008, egg producers, including Cal-Maine, Rose Acre Hillandale Farms, and Daybreak Foods, were named as defendants in numerous antitrust cases. In these actions, the plaintiffs alleged, among other things, that, to raise the price of eggs, these egg producers conspired to restrict egg production through a sham animal-welfare program that reduced the laying hen flock sizes. The cases were consolidated as a multi-district litigation in the Eastern District of Pennsylvania under the name *In re Processed Egg Products Antitrust Litigation*, Case No. 08-md-2002. While some egg producers escaped liability, several, including Cal-Maine and Hillandale, settled the claims for millions of dollars.

131. In 2019, *Kraft Foods Global, Inc. et al. v. United Egg Producers, Inc. et al.*, an action brought by certain large buyers of egg products, was remanded out of the multi-district

[11] Letter to Gail Slater, Assistant Attorney General, from Senators Warrant and Banks, *available at* https://www.warren.senate.gov/newsroom/press-releases/senators-warren-banks-in-bipartisan-letter-push-doj-to-investigate-high-egg-prices-anticompetitive-behavior-by-egg-producers.

[12] https://calmainefoods.gcs-web.com/static-files/a09de99a-4b6b-44de-be16-ed07f41d2730.

litigation to the Northern District of Illinois, for trial. The case went to trial on October 17, 2023, against defendants including Cal-Maine and Rose Acre. On December 1, 2023, the jury returned a decision finding the defendants engaged in a conspiracy to fix the prices of eggs. The jury awarded the plaintiffs $17.8 million in damages ($53.3 million when trebled).

132. In 2020, the New York Attorney General alleged that Hillandale Farms exploited the COVID-19 pandemic to charge "unconscionably excessive" prices, justified by Urner Barry's indices, which themselves were based on data supplied by the industry. In the complaint, New York alleged that "Urner Barry's indices work like a feedback loop: Egg producers such as Hillandale tell Urner Barry their 'assessments' of egg prices; Urner Barry then repeats back to the egg industry their collective assessment, distilled into indexed prices; and egg producers such as Hillandale then use Urner Barry's indexed prices as benchmarks to price their eggs."[13] In 2021, the case was settled, and Hillandale agreed to donate 1.2 million eggs to local food banks throughout New York state.

133. In 2021, Alaska accused Urner Barry of aiding broiler producers in an "anticompetitive output restriction scheme" by serving as a conduit for competitively sensitive information and facilitating production cuts.[14]

**f. Defendants' Systematic Exchange of Competitively Sensitive Information via Urner Barry Violates Section 1 of the Sherman Act**

134. Defendants' information exchange amounts to an unlawful agreement in violation of Section 1 of the Sherman Act.

[13] Verified Petition, *New York v. Hillandale Farms Corporation, et al.*, No. 451650/2020 (Sup. Ct. N.Y. Aug. 11, 2020), at 11, ¶ 47.

[14] Complaint, *Alaska v. Agri Stats, Inc. et al.*, No. 3AN-21-04632CI (Sup. Ct. Alaska Sept. 23, 2021).

135. In 1996, FTC and DOJ published "Statements of Antitrust Enforcement Policy in Health Care" (the "1996 Policy"). The 1996 Policy gave guidance to the health care industry on various antitrust issues, including information sharing, and this has since been applied to industries outside of healthcare. Among other things, the 1996 Policy provided an "antitrust safety zone" for information exchanges. According to the 1996 Policy, an information exchange that fell within the safety zone was unlikely to raise antitrust concerns and would unlikely be challenged by the agencies. In subsequent years, the agencies used this safety zone as a general guideline for the legality of information exchanges in other industries.

136. The 1996 Policy was recently withdrawn by the DOJ. But while it was operative, to qualify for the safety zone, the information exchange would have had to meet the following requirements:

- The information exchange was managed by a third-party, like a trade association or government agency;
- the information provided by participants was relatively old (e.g. more than three months old); and
- the information was aggregated to protect the identity of the underlying sources, and enough sources were aggregated to prevent competitors from linking particular data to an individual source.

137. The agencies published this policy "to ensure that an exchange of price or cost data is not used by competing providers for discussion or coordination of provider prices or costs." It was important to the agencies that "providers [were] aware of the potential antitrust consequences of information exchanges among competitors." The agencies explained that these conditions were carefully crafted to balance a competitor's individual interests in obtaining useful information

"against the risk that the exchange of such information may permit [competitors] to communicate with each other regarding a mutually acceptable level of prices."

138. DOJ has recently demonstrated a renewed focus on prosecuting anticompetitive information sharing. As a result, on February 3, 2023, DOJ withdrew three antitrust policy statements, including the 1996 Policy discussed above. Critically, when announcing the withdrawal, DOJ said that "the statements ***are overly permissive on certain subjects, such as information sharing, and no longer serve their intended purposes of providing encompassing guidance to the public on relevant . . . competition issues in today's environment***."

139. The withdrawal of the policy statements was preceded by remarks made by principal Deputy Assistant Attorney General Doha Mekki on February 2, 2023, in which she said that "throughout its enforcement and policy work, the DOJ has had 'serious concerns' about whether the factors set out in the safety zones are appropriate for the industry as it exists today." Mekki noted that "[e]xchanges facilitated by [third-party] intermediaries can have the same anticompetitive effect as direct exchange among competitors." Additionally, she said that "the suggestion that data that's at least three months old is unlikely to be competitively sensitive or valuable is underpinned by the rise of pricing algorithms that can increase the competitive value of historical data."

140. Following the withdrawal of the policy statements, at a conference in March 2023, Deputy Assistant Attorney General Michael Kades commented on DOJ's new position related to information sharing. Responding to questions on what proper information sharing looks like without safe harbors, Kades said that "top-of-mind questions should be what information is being shared, how it is being used, and what the impacts are of that sharing. Any time information sharing

appears to be suppressing price competition or eliminating other forms of competition, 'that should send red sirens off.'"

141. Expanding further, at the 2024 American Bar Association Antitrust Spring Meeting, DOJ antitrust division attorney Kathleen Kiernan stated that "information may be a couple of years old" and still run afoul of antitrust laws forbidding anticompetitive information exchanges. She emphasized that "DOJ looks at the nature of information exchanged and the age of the information . . . there's not a one-size-fits-all approach to ensuring information exchanges have 'absolutely no concern' for antitrust enforcers."[15]

142. Later in 2024, DOJ filed a Statement of Interest in *In re Pork Antitrust Litigation*, 18-cv-01776 (D. Minn.), where it reiterated its stance against anticompetitive information exchanges. In the Statement, DOJ stated that it filed the Statement to make clear that "(1) information sharing alone can violate Section 1, even without proof of an agreement to fix prices; and (2) information exchanges that report only aggregated data can violate the antitrust laws, even where the information is not linked to specific competitors."[16]

143. DOJ's position has not changed during the current Administration. In March 2025, Ryan Tansey, the section chief of the DOJ antitrust division's Washington Criminal Section, said at a conference "If I make no other point today, I just want to be very clear that that is not correct. . . . Characterizing conduct as an information exchange shouldn't be thought of as a way to insulate businesses from criminal antitrust scrutiny."[17]

[15] Chris May, "Exchanges of 'years-old' labor market data still create antitrust risk, US DOJ official says," mLex (April 11, 2024), *available at* https://content.mlex.com/#/content/1555754/exchanges-of-years-old-labor-market-data-still-create-antitrust-risk-us-doj-official-says.

[16] *In Re Pork Antitrust Litigation*, No. 18-cv-01776 (D. Minn.), Dkt. No. 2616.

[17] Chris May, "Outsourced pricing doesn't 'skirt' antitrust liability, US DOJ official says," mLex (March 11, 2025), *available at* https://content.mlex.com/#/content/1637762/outsourced-pricing-doesn-t-skirt-antitrust-liability-us-doj-official-says?referrer=portfolio_openrelatedcontent.

144. That same month, DOJ submitted a Statement of Interest in *In re Multipan Health Insurance Provider Litigation*, 1:24-cv-06795 (N.D. Ill.), in which it stated that "[c]oncerted action is conduct that joins together separate decisionmakers and thus deprives the marketplace of independent centers of decisionmaking. . . . Such joint action can take a variety of forms, from a written contract, to a trust agreement, to a secret conspiracy, ***to the joint delegation of decisionmaking power to a common agent***."[18] (emphasis added; internal quotations and citations omitted).

145. Considering DOJ's position that information exchanges can be anticompetitive regardless of their exact form, Defendants' information exchange violates Section 1 of the Sherman Act. Defendants' information exchange existed for the purpose of "depriv[ing] the marketplace of independent centers of decisionmaking,"[19] increasing egg prices above competitive levels, and maintaining those supracompetitive prices.

**g. "Plus Factors" in the Egg Industry Provide Additional Evidence of a Conspiracy**

146. Prominent legal and economic antitrust scholars studying collusive behavior have identified certain "plus factors," which are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and therefore support an inference of collusion.[20] Each plus factor that is present constitutes a piece of circumstantial evidence supporting active collusion, as opposed to mere conscious parallelism. The factors that provide the

---

[18] *In re Multipan Health Insurance Provider Litigation*, 1:24-cv-06795 (N.D. Ill.), Dkt. No. 382.

[19] *Id.*

[20] William E. Kovacic, *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393, 393 (2011).

most probative value and lead to a strong inference of explicit collusion are referred to as "super plus factors."[21]

147. Here, several plus and super plus factors support the plausible inference that Defendants are members of a *per se* unlawful price fixing cartel. These include: (1) Defendants' exchange of competitively sensitive information; (2) the presence of a price-verification scheme; (3) a motive to conspire; (4) opportunities and invitations to collude; (5) an increasingly concentrated market; (6) high barriers to entry; and (7) a commodity product.

148. ***First***, the reciprocal sharing of firm-specific competitively sensitive information that would normally remain private is a "super plus factor" that leads to a strong inference of active collusion.[22] As described above, Defendant Urner Barry compiles daily market reports by soliciting pricing information from producers, distributors, brokers, and buyers—including the Egg Producer Defendants—regarding transaction prices, bids, and offers. Egg producers, such as the Egg Producer Defendants, are able to maximize their prices by matching the benchmarks Urner Barry calculates based on the transaction data it receives. The data Urner Barry uses to calculate its benchmarks is data that would normally be kept confidential, given its competitively-sensitive nature. Because an egg producer would be competitively disadvantaged by sharing private data unilaterally, a rational actor would only do so with the expectation that it will benefit from similar private information shared by its competitors. Moreover, since it is well known in the egg industry that over 95% of eggs are sold pursuant to contracts pegged to Urner Barry's price quotations, each individual Egg Producer Defendant can be reasonably certain that the other Egg Producer

[21] *See id.* at 396-97.

[22] Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 Nw. Univ. L. Rev. 1581, 1608 (2021).

Defendants are supplying their competitively sensitive information to Urner Barry and are using the pricing benchmarks Urner Barry provides to maximize their egg prices.

149. The risk of collusion is further heightened because Urner Barry disseminates forward-looking forecasts to its subscribers. By jointly relying on the same projections of future supply, demand, and pricing, the Egg Producer Defendants could align their expectations and production plans around shared market outlooks—coordinating not only current pricing but anticipated future conditions. Such forward-looking data magnifies the anticompetitive potential of Urner Barry's system by enabling the Egg Producer Defendants to adjust production and pricing behavior in parallel based on common forecasts.

150. ***Second*****,** Urner Barry provides participating egg producers with a price-verification scheme, or "the practice of a seller reporting to its competitors the details of completed transactions with specific customers."[23] With Urner Barry, egg producers, such as the Egg Producer Defendants, are able to see benchmarks that measure where an egg producer stands in relation to others in their market. These benchmarks are based on actual transactions. This type of price-verification makes little sense absent collusion.

151. ***Third*****,** Urner Barry provides egg producers, including the Egg Producer Defendants, with a motive to conspire by advertising that Urner Barry provides valuable information to support maximizing profits.

152. ***Fourth*****,** Egg Producer Defendants are involved in multiple industry trade associations and regularly attend trade meetings, giving them ample time and opportunity to coordinate supply restraints and curtail cheating on the conspiracy.

[23] *Id.* at 1601.

153. The Egg Producer Defendants are members of UEP and AEB (American Egg Board), national trade associations representing large U.S. egg producers. These associations host meetings, conferences, and committee gatherings that bring together high-level executives from competing firms, providing a forum for illegal discussions and coordination.

154. For example, since 2021, the AEB and UEP have hosted an annual joint conference attended by Producer Defendants.

155. Moreover, employees of the Egg Producer Defendants have been on the board of UEP. For instance, In October 2023, Sherman Miller (CEO of Cal-Maine Foods) was elected Treasurer of the Board of UEP for 2024, and Marcus Rust (CEO of Rose Acre Farms) was elected as a representative at-large. The presence of senior executives from multiple Defendants in UEP's top leadership provides a continuing forum for regular communication and alignment among competitors.

156. Trade associations also create and disseminate "guidelines," "certification programs," and industry data that can be used as vehicles to orchestrate and monitor a collusive scheme. In fact, "at trial, the most important part" of the adjudicated conspiracy in *Kraft* was the "UEP Certified Program," which aided producers such as Cal-Maine and Rose Acre in restricting the supply of eggs.[24] UEP Certified is still in force today.

157. Additionally, Urner Barry hosts an annual Executive Conference which employees of Defendants have attended during the Class Period, including employees of Rose Acre, Daybreak, and Urner Barry. Urner Barry markets this event as "a must-attend event for decision-makers in the protein industry . . . Where the protein industry's most influential members go to

[24] *See Kraft Foods Global, Inc. v. United Egg Producers, Inc.*, Case No. 11-cv-8808, 2024 WL 4346418, at *5 (N.D. Ill. Sept. 30, 2024).

network, learn and advance their professional development."[25] Employees of Defendants have even been seen together at these conferences. As shown in Figure 7 below, Urner Barry and Rose Acre employees were photographed together at the 2011 conference. In 2021, Bill Rehm, CEO of Daybreak, was a guest speaker at the conference. Finally, Defendants, including at least Cal-Maine, have sponsored this event in the past. Trade association membership and industry events provide Defendants opportunities to collude.



*Wonderful weather and good company led to smiles all around for (L to R) Michele and Arron Heironimus, Rose Acre; Scott, Becky and Roger Seger, Wabash Valley; Urner Barry's Rick Brown; and Mickey Seger.*

**Figure 7.**[26]

158. ***Fifth,*** the egg market is increasingly becoming more concentrated. While the industry was once highly fragmented, in recent years large egg producers, including the Egg Producer Defendants, have grown exponentially through acquisitions. A conspiracy is easier to effectuate, maintain, and enforce in a concentrated industry.

159. ***Sixth***, egg producers face significant entry barriers including financial, regulatory, operational, and logistical costs.

---

[25] https://redmidia.com/eventos/urner-barrys-executive-conference-2021/

[26] https://www.urnerbarry.com/reporter/issues/ReporterV6N3_WEB.pdf.

160. Potential new entrants face a variety of capital costs, including land acquisition, construction of specialized poultry houses, and purchases of feeding, watering, climate control, and waste management equipment.

161. Potential new entrants would also need to displace long-standing customer relationships.

162. Thus, new entrants into the market are unlikely to discipline cartel pricing.

163. ***Seventh***, Conventional Eggs are a fungible commodity with minimal product differentiation, a market characteristic that greatly simplifies the formation and maintenance of a price-fixing conspiracy. When products are homogenous, firms compete primarily on price. This creates a powerful incentive to collude, as price competition in a commodity market can be destructive to profits. By agreeing to fix prices or restrict output, competitors can avoid price wars and collectively exercise market power.

164. Government grading standards make Conventional Eggs functionally identical, eliminating non-price competition and simplifying the detection of price deviations.

165. Conventional Eggs also exhibit relatively inelastic demand — i.e., consumers purchase similar quantities regardless of price fluctuations. Indeed, demand for eggs remained steady throughout the higher prices during the Class Period.

166. As one Cal-Maine investor presentation noted, "The price of eggs in relation to the overall amount we spend on groceries does not matter. A $1-$2 increase in an item we purchase once a month is not that big of deal in the grand scheme of things."[27]

167. Because of this price inelasticity, the structure of the egg production market makes the egg industry particularly susceptible to price manipulation. Small artificial reductions in supply

[27] *See* Cal-Maine 2Q 2025 Investor Presentation, n.82 at 5.

can yield disproportionately large increases in price and profit for producers, including Defendants.

## V. ANTICOMPETITIVE EFFECTS AND RELEVANT ANTITRUST MARKET

168. Defendants' anticompetitive conduct had the following effects, among others:

- Competition among the Egg Producer Defendants has been restrained or eliminated with respect to egg prices;
- The price of eggs has been fixed, stabilized, or maintained at artificially high levels; and
- Individuals have been deprived of free and open competition.

169. Defendants' violations of the antitrust laws have caused Plaintiffs and members of the Class to pay higher prices for eggs than they would have in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, Plaintiffs and members of the Class have suffered damages in the form of overcharges paid on their egg purchases. This is an injury of the type that the antitrust laws were meant to punish and prevent. Defendants' price fixing agreement and information exchange are *per se* unlawful, or, alternatively, are unlawful under either a quick look or rule of reason analysis.

170. Under the *per se* standard, and additionally where, as here, there are demonstrable anticompetitive effects, a relevant product and geographic market need not be defined. However, Plaintiffs define such markets below in case their allegations are ultimately analyzed under a quick look or rule of reason analysis.

### A. The Relevant Product Market Is Conventional Shell Eggs

171. To the extent a relevant product market needs to be defined in this action, it is the market for conventional "shell eggs", also known as "table eggs." Shell eggs are eggs in the form

most familiar to buyers: fresh, uncooked, and in an intact shell. Most shell eggs are sold at retail outlets such as grocery and convenience stores.

172. According to the USDA, in 2023, approximately 70% of eggs produced in the United States were sold as shell eggs. The remaining 30% of eggs produced in the United States were sold as egg products (i.e. shell eggs broken and sold in liquid, frozen, or dried form).

173. Conventional shell eggs are versatile and can be used in a wide range of culinary applications, including baking, frying, boiling, poaching, and scrambling. Because shell eggs are purchased fully intact, there are no limits to their culinary applications. Previously broken egg products like liquid eggs are often pre-mixed to combine the yolk and whites. By mixing the yolk and the whites, egg products' culinary applications are generally limited to making scrambled egg and the preparation of certain baked goods.

174. Additionally, many egg consumers prefer the flavor and texture of freshly-cracked shell eggs over egg products. Egg buyers also value shell eggs because they generally do not contain additives, preservatives, or stabilizers, like egg products.

175. "Conventional" shell eggs are differentiated from "specialty" shell eggs which include cage-free, organic, brown, free-range, pasture-raised, or nutritionally enhanced shell eggs. Conventional shell eggs make up the majority of shell eggs sold in the United States. In 2024, conventional shell eggs held almost three-quarters of the U.S. shell egg market, followed by cage-free eggs at about 23.2 percent, and pasture-raised at less than five percent.

176. Accordingly, there are no reasonable substitutes for conventional shell eggs and they are a distinct product market.

### B. The Relevant Geographic Market Is National

177. Should a geographic market need to be defined in this action, it is the United States. The Egg Producer Defendants produce and distribute eggs through locations across the United States and have increased egg prices nationwide.

## VI. STATUTE OF LIMITATIONS AND TOLLING

178. Plaintiffs and members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and Class Members did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this action.

179. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from Plaintiffs and members of the Class.

180. Plaintiffs and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or any of the facts that could or would have led to the discovery thereof, until March 2025, when news of the DOJ's investigation into egg prices broke.

181. Due to Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiffs or members of the Class has been tolled during the period of such fraudulent concealment.

## VII. CLASS ALLEGATIONS

182. Plaintiffs brings this action individually and on behalf of all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), equitable and injunctive relief, on behalf of the following Class:

> All persons and entities who purchased shell eggs indirectly from one or more Egg Producer Defendant, or from any division, subsidiary, predecessor, agent, or affiliate of such Egg Producer Defendants, at any time during the period of January 1, 2022 ("Class Period") until Defendants' unlawful conduct and its anticompetitive effects cease to persist (the "Class").

183. also bring this action on behalf of herself and as a class of purchasers from the Indirect Purchaser States under Rule 23(a) and (b)(3), seeking damages pursuant to state antitrust and consumer protection laws as well as common law unjust enrichment on behalf of the following class:

> All persons and entities in Indirect Purchaser States who purchased shell eggs indirectly from one or more Egg Producer Defendant, or from any division, subsidiary, predecessor, agent, or affiliate of such Egg Producer Defendants, at any time during the period of January 1, 2022 ("Class Period") until Defendants' unlawful conduct and its anticompetitive effects cease to persist (the "Damages Class").

184. The "Indirect Purchaser States," for purposes of this Complaint, include Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, and Wisconsin.

185. The following persons and entities are excluded from the above-described proposed Class:

- Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;
- All governmental entities;
- All Counsel of Record; and
- The Court, Court personnel, and any member of their immediate families.

186. The Class is so numerous as to make joinder impracticable. Plaintiffs do not know the exact number of Class members because such information is presently in the exclusive control

of Defendants. Plaintiffs believe that due to the nature of the industry there are likely, at a minimum, hundreds of thousands of Class members in the United States and its territories.

187. Common questions of law and fact exist as to all members of the Class. Plaintiffs and the Class were injured by the same unlawful scheme, Defendants' anticompetitive conduct was generally applicable to all members of the Class, and relief to the Class as a whole is appropriate. Common issues of fact and law include, but are not limited to, the following:

- Whether Defendants exchanged competitively sensitive information;
- Whether Defendants and their Unnamed Co-conspirators engaged in a combination or conspiracy to fix, raise, maintain or stabilize prices for eggs;
- The duration of the conspiracy alleged herein and the acts performed by Defendants and their Unnamed Co-conspirators in furtherance of the conspiracy;
- Whether such combination or conspiracy violated the federal antitrust laws;
- Whether the conduct of Defendants and their Unnamed Co-conspirators, as alleged in this complaint, caused injury to the Plaintiffs and other members of the Class;
- Whether Defendants caused Plaintiffs and the Class to suffer damages in the form of overcharges on eggs;
- The appropriate class-wide measure of damages; and
- The nature of appropriate injunctive relief to restore competition in the egg market.

188. Plaintiffs' claims are typical of the claims of Class members, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs and all members of the Class are

similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for eggs.

189. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs' interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

190. Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

191. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

192. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

193. Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## VIII. CAUSES OF ACTION

**FIRST CLAIM FOR RELIEF**
**Price Fixing in Violation of**
**Section 1 of the Sherman Act (15 U.S.C. § 1)**
**(For Injunctive Relief Only)**

194. Plaintiffs repeat the allegations set forth in Paragraphs 1 to 193, above, as if fully set forth herein.

195. Beginning at a time currently unknown to Plaintiffs, but at least as early as January, 1 2022 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

196. The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the price of eggs and involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

197. Plaintiffs and members of the Class have been injured and will continue to be injured in the form of overcharges on eggs.

198. Defendants' anticompetitive conduct had the following effects, among others:

- Competition among Defendants has been restrained or eliminated with respect to egg prices;
- The prices of eggs have been fixed, stabilized, or maintained at artificially high levels; and

- Plaintiffs and members of the Class have been deprived of the benefits of free and open competition between and among Defendants.

199. This conduct is unlawful under the *per se* standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

200. Plaintiffs and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## SECOND CLAIM FOR RELIEF
**Information Exchange in Violation of**
**Section 1 of the Sherman Act (15 U.S.C. § 1)**
**(For Injunctive Relief Only)**

201. Plaintiffs repeat the allegations set forth in Paragraphs 1 to 193, above, as if fully set forth herein.

202. Beginning at a time currently unknown to Plaintiffs, but at least as early as January, 1 2022 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

203. The contract, combination, or conspiracy involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

204. Plaintiffs and members of the Class have been injured and will continue to be injured in the form of overcharges on eggs.

205. This information exchange has been undertaken in furtherance of a price fixing agreement, which is unlawful *per se*. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the exchange is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

206. Plaintiffs and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

**<u>THIRD CLAIM FOR RELIEF</u>**
**Violations of**
**State Antitrust Laws**

207. Plaintiffs repeat the allegations set forth in Paragraphs 1 to 193, above, as if fully set forth herein.

208. On account of the combination, conspiracy, or agreement to unreasonably restrain trade in the market for Replacement Tires, Defendants have violated, and Plaintiffs and members of the Class are entitled to relief under, the antitrust laws of the states of Arizona, California, Colorado, Connecticut, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, as well as the District of Columbia, as follows:

a. Ariz. Rev. Stat. Ann. §§ 44-1403, *et seq.*;

b. Cal. Bus. Code §§ 16700, *et seq.*;

c. Colo. Rev. Stat. § 6-4-101, *et seq.*;

d. Conn. Gen. Stat. §§ 35-27, *et seq.*;

e. D.C. Code §§ 28-4503, *et seq.*;

f. Haw. Rev. Stat. §§ 480-2, 480-9, *et seq.*;

g. 740 Ill. Comp. Stat. §§ 10/3, *et seq*.;

h. Iowa Code §§ 553.5, *et seq.*;

i. Kan. Stat. Ann. §§ 50-112, *et seq.*;

j. Me. Rev. Stat. Ann. 10 §§ 1102, *et seq.*;

k. MD Code Ann., Com. Law, §§ 11-204, *et seq.*;

l. Mich. Comp. Laws Ann. §§ 445.773, *et seq.*;

m. Minn. Stat. §§ 325D.52, *et seq.* and Minn. Stat. §§ 8.31, *et seq.*;

n. Miss. Code Ann. §§ 75-21-3, *et seq.*;

o. Neb. Rev. Stat. §§ 59-802, *et seq.*;

p. Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*;

q. N.H. Rev. Stat. Ann. §§ 356:3, *et seq.*;

r. N.M. Stat. Ann. §§ 57-1-2, *et seq.*;

s. N.Y. Gen. Bus. Law § 340;

t. N.C. Gen. Stat. §§ 75-2.1, *et seq.*;

u. N.D. Cent. Code Ann. §§ 51-08.1-03, *et seq.*;

v. Or. Rev. Stat. §§ 646.730, *et seq.*;

w. P.R. Laws Ann. tit. 10 §§ 258, *et seq.*

x. R.I. Gen. Laws §§ 6-36-5, *et seq.*;

y. S.D. Codified Laws §§ 37-1-3.2, *et seq.*;

z. Tenn. Code Ann. §§ 47-25-101, *et seq.*;

aa. Utah Code Ann. §§ 76-10-3104, *et seq.*;

bb. Vt. Stat. Ann. 9, §§ 2453, *et seq.*;

cc. Virginia Code §§ 59.1-9 *et seq.* (§ 59.1-9.5);

dd. W.Va. Code §§ 47-18-4, *et seq.*; and

ee. Wis. Stat. §§ 133.03, *et seq.*

209. Plaintiffs and members of the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in herein. Their injuries consist of paying higher prices for Replacement Tires than they would have paid in the absence of Defendants' conduct. These injuries are of the type the antitrust laws were designed to prevent and flow from Defendants' conduct unlawful.

210. Plaintiffs and the proposed Damages Class seek damages and multiple damages as permitted by law for their injuries by Defendants' violation of the aforementioned statutes.

**FOURTH CLAIM FOR RELIEF**
**Violations of State**
**Unfair and Trade Practices Laws**

211. Plaintiffs repeat the allegations set forth in Paragraphs 1 to 193, above, as if fully set forth herein.

212. Defendants engaged in unfair competition and unfair/unconscionable or deceptive acts or practices in violation of the state consumer protection statutes identified below by entering into the combination, conspiracy, or agreement to unreasonably restrain trade in the market for Replacement Tires.

213. To the extent deception is required under the state laws below, Defendants concealed the anticompetitive and unlawful nature of their combination, conspiracy, or agreement to unreasonably restrain trade in the market for Replacement Tires.

214. Accordingly, consumers and other indirect purchasers of Replacement Tires were induced into purchasing, and will continue to purchase, Replacement Tires at inflated prices. Plaintiffs and members of the Damages Class could not reasonably have avoided injury from

Defendants' wrongful conduct. This injury is of the type the state consumer protection statutes were designed to prevent and directly flows from Defendants' unlawful conduct. Defendants' conduct occurred in connection with consumer transactions related to the availability and sale of Replacement Tires.

215. Defendants have violated, and Plaintiffs and members of the Damages Class are entitled to relief under, the Unfair Trade Practices and Consumer Protection Laws of the states of Arkansas, California, Connecticut, Florida, Idaho, Massachusetts, Missouri, Montana, New Mexico, New York, North Carolina, Rhode Island, South Carolina, Utah and Vermont, as well as the District of Columbia, as follows:

a. Ark. Code Ann.§§ 4-88-101, *et seq.*;

b. Cal. Bus. & Prof Code §§ 17200, *et seq.*;

c. Conn. Gen. Stat. §42-110a, *et seq.*;

d. D.C. Code §§ 28-3901, *et seq.*;

e. Fla. Stat. §§ 501.201, *et seq.*;

f. Idaho Code §§ 48-601, *et seq*.

g. Mass. Gen. Laws ch. 93A, *et seq.*;

h. Mo. Rev. Stat. §§ 407.010, *et seq.*;

i. Mont. Code Ann., §30-14-103, et seq., and §30-14-201, *et seq.*;

j. N.M. Stat. Ann. §§ 57-12-1, *et seq.*;

k. N.Y. Gen. Bus. Law §§ 349, *et seq.*;

l. N.C. Gen. Stat. §§ 75-1, *et seq.*;

m. R.I. Gen. Laws §§ 6-13.1-1, *et seq.*;

n. S.C. Code Ann. §39-5-10, *et seq.*;

o. Utah Stat. §§ 13-11-1, *et seq*.; and

p. VT. Stat. Ann., tit. 9, §2451, *et seq*.

**<u>FIFTH CLAIM FOR RELIEF</u>**
**Unjust Enrichment**
**(Against All Egg Producer Defendants)**

216. Plaintiffs repeat the allegations set forth in Paragraphs 1 to 193, above, as if fully set forth herein.

217. Alternatively, from the acts of Defendants as alleged above, the Egg Producer Defendants have been unjustly enriched at the expense of Plaintiffs and members of the Class.

218. Through Defendants' systematic exchange of competitively sensitive non-public information, the Egg Producer Defendants have artificially increased the price of eggs paid by Plaintiffs and members of the Class.

219. The Egg Producer Defendants reaped from Plaintiffs and members of the Class artificially high profits for eggs.

220. The Egg Producer Defendants have been unjustly enriched by retaining the artificially high profits for eggs collected from Plaintiffs and members of the Class.

221. The retention of these profits by the Egg Producer Defendants violates the fundamental principles of justice, equity, and good conscience and should be returned to Plaintiffs and members of the Class.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully asks this Court for the following:

A. The Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Interim Class

Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B. The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation (or alternatively illegal under a quick look or rule of reason standard) of Section 1 of the Sherman Act (15 U.S.C. § 1);

C. The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D. The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications;

E. The Court grant Plaintiffs and members of the Class all other equitable relief in the nature of disgorgement, restitution, and/or the creation of a constructive trust to remedy the Egg Producer Defendants' unjust enrichment;

F. The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Class for treble the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this complaint to the extent provided by law; and

G. The Court award Plaintiffs and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

**JURY TRIAL DEMANDED**

Plaintiffs and members of the Class demand a trial by jury on all claims so triable under Federal Rule of Civil Procedure 38(b).

Dated: January 28, 2026

Respectfully submitted,

/s/ *Carl V. Malmstrom*
Carl V. Malmstrom
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**
111 W. Jackson Blvd., Suite 1700
Chicago, Illinois 60604
Tel: (312) 984-0000
Fax: (212) 686-0114
malmstrom@whafh.com

Thomas H. Burt*
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
270 Madison Avenue

New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 686-0114
burt@whafh.com

Betsy C. Manifold*
Rachele R. Byrd*
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Tel: (619) 239-4599
Fax: (619) 234-4599
manifold@whafh.com
byrd@whafh.com

* to be admitted *pro hac vice*

***Attorneys for Plaintiffs and the Proposed Class***